UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

GARY D. CARTER and MARY ELAINE CARTER                    PLAINTIFF
Individually and as Co-Administrators of the
ESTATE OF JOSEPH ALEX CARTER

v.                                                                                      CIVIL ACTION NO. 3:04-CV487-S

CSX TRANSPORTATION, INC.                                              DEFENDANT

**MEMORANDUM OPINION**

This matter is before the court on the motions for summary judgment by the defendant, CSX Transportation, Inc. ("CSXT"). This is a personal injury case involving the death of Joseph Alex ("Joey") Carter, who was electrocuted when he came into contact with a wire that was part of CSXT's signal system. CSXT has made two separate motions for summary judgment, based on distinct substantive issues. For the reasons set forth below, the court will **grant** the defendant's motion for summary judgment on the basis of KRS 381.232 and, in light of this ruling, will **deny as moot** the motion for summary judgment based on supreme federal law.

FACTS

On May 27, 2004, Joey Carter, a minor aged 14 years and three months, was swimming in his family's pool with several friends. The children were shooting basketball from the pool when the ball went over the net his father had constructed above a fence running along the rear of the Carter property. The rear of the Carter property abuts CSXT's right of way. This right of way includes a railroad track and adjoining land containing poles which hold electric wires.

1

Joey exited his family's property through a gate in the fence and walked down an incline to retrieve the errant ball, which he then threw to his friends. As he came back up the incline, his hands came into contact with a service signal control wire belonging to CSXT. The wire was lying on or near the ground. It had been "retired" from service for 14 years, when CXST had replaced the signal control wires with in-track circuits. It is CSXT's practice to retire the wires "in place" so that the wires remain on the poles in a de-energized, disconnected state.

The retired signal wire involved in this accident had been cut at locations east and west of the Carter property so that the line was drooping to the ground. At pole 8[1], some 700-900 feet from the Carter home, the west end of this retired wire had become entangled with an energized AC line. Specifically, the retired wire was attached to an upper cross arm on Pole 8, but it had been cut or broken so that approximately 15 feet of its west end was hanging down. This end crossed over the energized live AC wire (which was attached to the lower cross arm), causing the retired wire to also become energized, drawing low voltage electrical current from the live AC wire. The east end of the retired wire had also been cut at some point east of the Carter home. It was this longer end that was on the ground behind the Carter home. When Joey touched the wire, he was electrocuted.

## DISCUSSION

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears the burden of establishing these elements *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Not every factual dispute

---

[1] The parties have agreed to a numbering system for the poles in the vicinity of the accident. *See* Plaintiff's Exhibit 11.

between the parties prevents summary judgment. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). To preclude summary judgment, the disputed facts must be material, such that "they might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The dispute must also be genuine, such that "if the facts were proven at trial, a reasonable jury could return a verdict for the non-moving party." *Id.* "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp.*, 822 F.2d at 1435. In making these determinations, the court views all facts and inferences in a light most favorable to the nonmoving party. *Id.*

### A. Joey Carter was a trespasser.

The level of care owed to an entrant by a landowner varies depending upon the entrant's classification. The common law recognizes three categories of entrants: invitees, licensees, and trespassers, with landowners owing a corresponding duty of care to each. CSXT maintains that Joey Carter was a trespasser, as that term is defined under Kentucky law:

> A trespasser means any person who enters or goes upon the real estate of another without any right, lawful authority or invitation, either express or implied, but does not include persons who come within the scope of the "attractive nuisance" doctrine.[2]

KRS 381.231(1). It is undisputed that Joey Carter left his parents' yard, exiting through the back gate as he entered CSXT's right of way where the accident occurred.

---

[2] In Kentucky, the attractive nuisance exception "does not apply in the case of a child who is more than 14 years of age," absent a showing that the child has a "subnormal" mental capacity. *Kentucky Utilities Co. v. Earles' Adm'r*, 222 S.W.2d 929, 930 (Ky. 1949); *Com. v. Henderson's Guardian*, 53 S.W.2d 694 (1932). *See also Bently v. South-East Coal Co.*, 334 S.W.2d 349 (Ky. 1960). There is no record evidence indicating that Joey Carter was not of normal mental capacity for his age. Accordingly, the attractive nuisance exception to the trespasser statute is inapplicable because Joey was over age 14.

3

Nonetheless, the Carters maintain that Joey was not a trespasser, but rather a "gratuitous licensee." To support this assertion, they suggest that Joey had "implied permission" to enter CSXT's right of way, arguing that CSXT employees could observe that its right of way was "in use by the public." Plaintiff's Response (DN 40), p. 13, 15. Where habitual, open public use of a private right of way occurs "without manifest objection," entrants are properly characterized as gratuitous licensees. *See Louisville and Nashville Railroad Company v. Blevins,* 293 S.W.2d 246, 249 (Ky. 1956). The facts at bar, however, do not establish that CSXT's right of way was publicly used in any sort of open or notorious manner.

In *Blevins*, the plaintiff was struck by a train while driving on railroad property near the tracks. *Id.* at 247. There was evidence that a street adjacent to the railroad tracks often backed up with trucks loading and unloading at a nearby business. The plaintiff also presented evidence that local drivers habitually bypassed these traffic jams by driving off the street onto the railroad's property, where the plaintiff's accident occurred. The evidence indicated that local drivers used this route openly and notoriously for years and that it was well packed down from such regular use. *Id.* at 248-49.

The Carters also cite *Louisville & Nashville R. Co. v. Spoonamore's Adm'r*, 129 S.W.2d 175 (Ky. 1939) and *Dixon v. CSX Transportation, Inc.*, 947 F.Supp. 296 (E.D. Ky. 1996) in support of their position that Joey was a gratuitous licensee. In *Spoonamore*, a teenager was killed while walking on the railroad tracks. The plaintiff presented evidence of four to six feet wide well-beaten paths, which were used by the public to access a swimming beach, a spring and a small town. The evidence indicated that the public regularly and openly used the track as a walking path and that at times there were 30 or more people using the tracks in that manner. In *Dixon*, the plaintiff teenager drowned after jumping from an active railroad bridge into the water below. The plaintiff presented

4

evidence that the area was a popular spot for swimmers and both parties agreed that locals frequented the area and jumped from the bridge. The facts in the case at bar bear little resemblance to those of either *Blevins, Spoonamore* or *Dixon*.

The Carters point out that CSXT's right of way abutted a residential neighborhood. They claim that CSXT personnel "could clearly see the neighborhood's interaction with the right of way" because "balls, wooden horses, grills and other family use items" were found on the right of way. Plaintiff's Response (DN 40), p. 8. A survey of the right of way, completed after the accident, reveals that several balls were found there and a photo taken after the accident depicts a grill stored behind a fence. Plaintiff's Exhibits 11, 13. These exhibits are insufficient to establish the kind of open and notorious use necessary to convert Joey Carter from a trespasser to a gratuitous licensee.

In fact, the record suggests that the right of way was not used by the families. The balls found abandoned on the right of way suggest that the ballplayers did not enter the property to retrieve the errant balls. Testimony taken during discovery reveals, without question, that the neighborhood children were instructed not to go on the right of way and that they obeyed these instructions. *See* Gary Carter Depo., pp. 37-39;[3] Mary Carter Depo., p. 16; Ty Cheatam Depo., pp. 10-11; Ryan Rhodes Depo., pp. 11-12.

The Carters have failed to present enough evidence from which a jury could reasonably conclude that CSXT's right of way was openly and notoriously used by the public. While the "disputed issue does not have to be resolved conclusively in favor of the non-moving party," the Carters are "required to present some significant probative evidence which makes it necessary to

---

[3] While Gary Carter did mention that it is possible his son might have been behind the fence at some point when accompanied by his father, that does not establish the type of open, regular usage necessary to transform trespassers into gratuitous licensees.

5

resolve the parties' differing versions of the dispute at trial" in order to survive this motion for summary judgment. *60 Ivy Street Corp.*, 822 F.2d at 1435. There is no such evidence in the record.

### *B. CSXT did not violate the duty it owed to trespassers.*

Under Kentucky law, a landowner owes a duty to avoid intentionally harming trespassers. "The owner of real estate shall not be liable to any trespasser for injuries sustained by the trespasser on the real estate of the owner, except for injuries which are intentionally inflicted by the owner or someone acting for the owner." KRS 381.232. Accordingly, landowners have no duty to make their property safe for trespassers.

*Kirschner v. Louisville Gas & Elec. Co.*, 743 S.W.2d 840 (Ky. 1988) is the seminal case interpreting the phrase "intentionally inflicted" as used in the relevant statute. In *Kirschner*, the Kentucky Supreme Court construed the phrase as encompassing any means inflicted by "willful, wanton or reckless conduct." The court continued:

> The usual meaning assigned to "willful," "wanton," or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that the harm would follow, and which is thus usually accompanied by a conscious indifference to the consequences . . .

*Id*. at 843.

In *Kirschner*, the minor plaintiff suffered severe injuries when he was shocked by arcing electricity while standing on a platform of an electrical transmission tower. The *Kirschner* court upheld summary judgment in favor of the defendant electrical company, finding no record evidence that the defendant had done an act of unreasonable character according to the relevant standard.

The *Kirschner* court summarized the duty described above as one to avoid setting a "trap." *See id.* at 845. The Carters argue that the wire lying behind their yard on CSXT's right of way was, in fact, just such a trap. Plaintiff's Response (DN 40), p. 15. The Carters claim they are "prepared

6

to offer proof" that CSXT repair crews cut the retired line and retied it to the top cross arm of Pole 8, allowing approximately 15 feet to dangle from the pole. They claim that these same repair crews also reattached the AC wire which eventually came into contact with the retired wire. They claim that the crews improperly attached the AC wire to the lower cross arm, allowing it to move laterally below the dangling, retired wire.

It is undisputed that the retired wire did, ultimately, lap over the live AC line at Pole 8, re-energizing the wire that killed Joey Carter. However, the Carters have failed to produce any evidence from which a jury could draw the conclusion that CSXT engaged in any act of unreasonable character which was the equivalent of setting a "trap" for a trespasser like Joey Carter. In addition to two pictures showing the overlapping lines on Pole 8, the Carters direct the court to CSXT's internal repair records. *See* Plaintiff's Exhibit 4. Those records indicate that repairs were made on April 28, 2002 and August 7, 2003.[4] The April 2002 repairs were made after a storm had blown a tree through the line between poles 8 and 9. The repair crew removed the tree and reattached an AC line because the tree had broken one of the cross arms. The August 2003 repairs were made after a storm had blown two trees onto the line at the same location. The records indicate only that the crew "cleared 2 trees from the line." It makes no mention of damage or repairs to any wire.

These repair records merely show that on at two occasions, the first more than two years before the accident in question and the other approximately eight months before the accident, CSXT made repairs on Pole 8 and reattached an AC line. The maintenance records make absolutely no

---

[4] The Carters direct the court to an entry made on August 2nd, 2003, claiming that a storm caused a tree to fall on a line that day. Plaintiff's Response (DN 40), p. 5. A review of the maintenance records, however, indicates that the removal of the tree from the line actually occurred on August 7th, 2003. The August 2nd entry involves a cross warning system incident and makes no mention of a tree on the line. Accordingly, we assume the relevant incident is actually the August 7th entry. *See* Plaintiff's Exhibit 4, p. 2.

7

mention of the retired line that electrocuted Joey Carter. There is no record evidence indicating that CSXT cut the retired wire or left it free to dangle above an improperly attached AC line. There is no record evidence indicating which AC line was put back up on April 28, 2002. There is no record evidence indicating which cross arm was broken by that storm in April of 2002. There is no record evidence indicating whether the repair crews attached the AC line to an insulator on that day. In short, there is no record evidence from which a jury could conclude that the repair crews left the lines in the manner in which they existed on the day in which Joey Carter was electrocuted. Such a conclusion would be based on mere speculation and wholly unsupported by the record. The Carters are unable to identify any act taken by CSXT that was of such an unreasonable character as to disregard an obvious risk of probable harm.

In fact, many of the acts of which the Carters complain are not relevant to the question at hand. For instance, the Carters repeatedly mention CSXT's failure to properly maintain the poles and the brush behind the Carter's neighborhood. Their argument is aptly summarized by the following sentence: "It is hard to conceive of a more inherently dangerous concealed condition than a live electrical wire, drooping from crumbling train poles, energized by ignorant and reckless repair and meandering obscured through brushy vegetation left uncleared in violation of federal law." Plaintiff's Response (DN 40), p. 23. The relevant conduct, however, is CSXT's treatment of its retired signal wires. CSXT has produced evidence indicating that it did not see retired wires which were dangling to the ground as anything more than a possible tripping hazard. In fact, families in the neighborhood have suggested that the wire which killed Joey was actually down for a year or more before the accident and that it was harmless. The Carters do not dispute that their older son testified he touched the same wire and that it was not energized at that time, approximately 8-9 months before the accident in question and more than a year after the April 2003 repairs were made

8

on Pole 8. The retired wire did not present an obvious risk of probable harm *unless and until it became re-energized.* Even assuming all of the other actions complained of were causally necessary to Joey's death, none of them, alone, was sufficient. There is no doubt that the re-energizing of the retired wire, which can be directly traced to its coming into contact with the live AC wire at Pole 8, was a necessary cause of his death. Absent evidence of any conduct by CSXT that caused the wire to come into contact with the live AC wire or evidence indicating that CSXT knew or should have known of the danger of dangling retired wires becoming re-energized, the Carters cannot prevail on their claims.

Both parties cite a case previously considered by this court in which a minor on a motorized dirt bike was injured when he rode into a thin cable erected by the property owner of the private road on which the minor was traveling. *See Middleton v. Reynolds Metals Co.*, 963 F.2d 81 (6th Cir. 1992). In *Middleton*, the landowner's property manager erected a 1/4 inch steel cable approximately 18 inches from the ground across the entrance road leading to the landowner's private property. There was evidence that teenaged boys rode motorized dirt bikes on the landowner's property. The property manager testified that he erected the cable ***in order to prevent trespassing***. There was also evidence that the property manager had marked such cables with empty milk jugs on previous occasions, but chose to leave this particular cable unmarked in any way. There was also evidence that the boy who was injured by the cable was unable to see it in time to avoid hitting it. The Sixth Circuit Court of Appeals reversed this court's grant of summary judgment to the landowner.

We are mindful of the Sixth Circuit Court of Appeals' statement that "summary judgment is likely to be inappropriate in cases where the issues involve intent." *Id.* at 883. The *Middleton* court also recognized, however, that plaintiffs are required to "demonstrate that there exist for their

cases more than a mere scintilla of evidence on which a jury could reasonably rely." *Id.* As already discussed above, there is no record evidence from which a jury could reasonably conclude that CSXT cut the retired wire and left it in a position where it was highly likely that it would become entangled with a live AC wire. The facts at bar are distinct from those in *Middleton* where the plaintiff presented evidence that the steel cable was intentionally erected to prevent known trespassing. The *Middleton* court determined that a reasonable jury could conclude from the evidence that the landowner essentially created a hidden "trap" likely to cause harm to trespassers. In contrast, the *Kirschner* court affirmed the lower court's dismissal based on the absence of any evidence indicating that the defendant was aware of the presence of trespassers on the tower or that it had concealed any dangers presented by the tower. *Kirschner,* 743 S.W.2d at 845. These facts are analogous to those at bar and, accordingly, warrant a similar conclusion. The Carters have failed to present any evidence that CSXT knew of the presence of trespassers or that it concealed any danger relating to its retired wires.

The Carters final argument is that "a higher degree of care is owed when dealing with the inherently dangerous nature of electricity." Plaintiffs' Response (DN 40), p. 23. This rule, however, does not apply to trespassers. In fact, in *Lambert v. Franklin Real Estate Co.*, 37 S.W.3d 770, 777 (2000), a case cited by the Carters, the Kentucky Court of Appeals stated that "[i]n constructing and maintaining electrical lines[,] the highest degree of caution must be exercised for the protection of all persons *at places where they have a right to go* . . ." (emphasis added). It bears noting that the *Kirschner* opinion, which involved the duty owed to a trespasser by an electrical utility company, made no mention of a heightened duty of care in maintaining the electrical transmission tower.

This accident was undoubtedly a terrible tragedy. The loss of such a young life is unspeakable. That, however, is not the measure of liability before this court. The relevant legal

10

analysis has been plainly set forth by the Kentucky courts. Applying that standard, we find no record evidence from which a jury could conclude that CSXT engaged in any unreasonable act in disregard of an obvious risk of probable harm to trespassers such as Joey Carter. Accordingly, we will grant the defendant's motion for summary judgment. A separate order will be entered herein this date in accordance with this opinion.

cc: Counsel of Record